831 F.2d 1064
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Catherine M. BOMBA, Defendant-Appellant.
 No. 86-1638.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1987.
 
 Before BOYCE F. MARTIN Jr., and BOGGS, Circuit Judges and WISEMAN, Chief District Judge.*
 PER CURIAM.
 
 
 1
 Catherine Bomba appeals her conviction, following a jury trial, for knowingly possessing a stolen interstate shipment of weight lifting equipment, in violation of 18 U.S.C. Sec. 659 (1982).[1] Bomba contends that there was insufficient evidence to establish that she knew the equipment was stolen. Fed.R..Crim.P. 29(a). We affirm.
 
 
 2
 * In reviewing the denial of a motion for judgment of acquittal, we consider the evidence as a whole, taken in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 319 (1979). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984), cert. denied sub nom. Freeman v. United States, 469 U.S. 1193 (1985) (and cases cited therein).
 
 
 3
 At all times pertinent to this case, Bomba was the President of Trio Transport, a trucking company. In December 1981, Bobby Weatherman, a truck broker for S & M Transportation of Wittier, California, arranged for Ronald Harris, a truck driver for Trio Transport, to transport a truckload of weight lifting equipment from Ivanko Barbell Company ("Ivanko") in California to Fitness Equipment Company ("Fitness") in Milwaukee, Wisconsin. Using a Trio Transport truck, Harris picked up the weight lifting equipment from Ivanko on December 4, 1981 and drove to S & M Transportation. There, he completed the paperwork and obtained partial payment for the trip.[2]
 
 
 4
 The next day, Harris arrived in Sierra Vista, Arizona, where Bomba and her daughter were staying with Bomba's parents. That afternoon, Bomba and her daughter swept the truck and loaded various personal items in it with the' assistance of Bomba's father and Harris. Bomba, her daughter, and Harris boarded the truck and drove toward Saginaw, Michigan where Bomba owned a home. After briefly stopping in Dallas, Texas[3] and Effingham, Illinois, where Harris had Weatherman wire some additional money, Bomba and Harris arrived in Saginaw on December 9.
 
 
 5
 On the morning of December 9, Bomba arranged for Harris to transport a load from Greenville, Michigan to Melrose Park, Illinois. At Bomba's direction, Harris took her personal items off the truck and stored them in Bomba's garage in preparation for the Greenville load. On December 10, Harris, travelling alone, delivered the Greenville load and proceeded to Fitness in Milwaukee.
 
 
 6
 Harris arrived at Fitness on December 10 and demanded $390 for delivery of the weight lifting equipment. In support of his demand, he presented a bill of lading which had been altered to reflect a C.O.D. charge. As a result of the dispute that developed,[4] the equipment was loaded back on the truck and Harris returned to Saginaw with the shipment. Shortly afterwards, Fitness reported the aborted delivery to police authorities as a theft.
 
 
 7
 At 2:14 p.m. that same day, Harris called Bomba from Milwaukee and told her about the aborted delivery. When Harris arrived in Saginaw later that evening, Bomba allowed him to unload the weight lifting,equipment from the truck into a storage trailer at her house. Bomba asked her brother, William Brenner, to help remove the equipment from the truck. Mark Zwerk, a friend of Brenner's . who also helped unload the weights, testified that he heard Bomba tell Harris and Brenner that she wanted to "get the weights off of her trailer, so she could make repairs on her truck and pay for fuel that was used on her truck."
 
 
 8
 A week or two later, the weight lifting equipment was sold. According to Brenner, Bomba contacted an attorney who told her that she could sell the weights to recover her fuel costs. Bomba' asked for Brenner Is advice, and he told her that she probably could sell the equipment after waiting thirty days. Brenner testified that Bomba then told him to sell the weights.[5] Brenner and Zwerk sold the weight lifting equipment shortly before Christmas (sometime between December 18 and 25) to two weight shops in Saginaw. One purchaser testified that he picked up the weights at Bomba's storage trailer.
 
 
 9
 Weatherman of S & M Transportation testified that he had called Bomba some five times during December trying to locate the shipment. During his initial call on December 9 or 10, Bomba denied that the weights had come from California on her truck, claiming that when she boarded the truck in Arizona there was nothing on it but personal items. In subsequent conversations, some initiated by Bomba, she told Weatherman about Harris's aborted delivery and promised the weights would be delivered.
 
 
 10
 Finally, on December 28, 1981, Bomba told Weatherman that she did not know where the truck was, where Harris was, or where the shipment of weights was. According to Weatherman, she believed the truck had been abandoned somewhere in Indiana, but the load was not in the trailer.[6]
 
 
 11
 John King, an agent of the Federal Bureau of Investigation, interviewed Bomba on January 22, 1982. He testified that Bomba told him that, when she entered the truck in Arizona, it was empty except for six or eight wooden pallets. In a second interview in September, Bomba denied ever seeing the weights or knowing what happened to them.
 
 II
 
 12
 The sole issue in this appeal is whether there was sufficient evidence from which the jury could reasonably have concluded that Bomba knew the weight lifting equipment was stolen. The knowledge element of section 659 requires the government to prove, and the jury to find, that "the defendant had actual knowledge that the goods charged in the indictment were stolen." United States v. Knight, 535 F.2d 1059, 1061 (8th Cir.1976) (emphasis in original). See United States v. Welsh, 721 F.2d 1142, 1145 (7th Cir.1983); United States v. Henneberry, 719 F.2d 941, 947 (8th Cir.1983), cert. denied sub nom. Youngerman v. United States, 465 U.S. 1107 (1984). The government may prove guilty knowledge either by direct or circumstantial evidence. As we said in United States v. Scruggs, 549 F.2d 1097, 1104 (6th Cir.), cert. denied, 434 U.S. 824 (1977) (citations omitted):
 
 
 13
 Proof of knowledge, like proof of intent, is rarely established by direct evidence. It has long been recognized in this circuit and elsewhere that circumstantial evidence--independent facts from which an inference of the ultimate fact to be established may rationally be drawn in light of common experience--can be sufficient to support a jury's determination that a defendant had guilty knowledge beyond a reasonable doubt.
 
 
 14
 Accord, United States v. Flaherty, 668 F.2d 566, 579 (1st Cir.1981); United States v. Hardesly, 645 F.2d 612, 614 (8th Cir.1981) ("guilty knowledge relate[s] to the condition of the mind, and since the condition of the mind is rarely susceptible to direct proof, recourse must be to all pertinent circumstances")(citations omitted).
 
 
 15
 Bomba moved for a judgment of acquittal at the close of the government's case in chief. After the motion was denied, she presented evidence on her own behalf and did not, thereafter, renew her motion. She thus forfeited her right to challenge the sufficiency of the evidence absent a manifest miscarriage of justice. United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984); Unite;d States v. Van Dyke, 605 F.2d 220, 225 (6th Cir.), cert. denied, 444 U.S. 994 (1979).
 
 III
 
 16
 Bomba contends that the evidence, at best, contains conflicting inferences that she "either knew of the existence of the barbell equipment or did not know of (its] existence to ;but the jury could not find from the evidence that she knowingly possessed stolen property. We disagree.
 
 
 17
 As early as December 10, Bomba knew that Harris failed to deliver the weight lifting equipment to Fitness, when she received a telephone call from him in Wisconsin. She also knew later that day that the weights were in her storage trailer at her home because she allowed Harris tO load them there. Yet, when Bomba spoke to Weatherman on December 28 (or on or after December 30, by her testimony), she told him that Harris had abandoned her truck, that the weights were not in the truck, and that she did not know where the shipment was.
 
 
 18
 Moreover, Bomba knew the weights were sold late in December. Indeed, she acknowledged consulting her brother and an attorney that month for information on selling the weights, and admitted speaking to various storage companies about disposing of the equipment. However, during her interview with FBI agent King in September 1982, Bomba denied ever seeing the weights or knowing what happened to them.[7]
 
 
 19
 Bomba's conflicting stories indicate an attempt to disassociate herself from property she had in her possession and to mislead those looking for the weight lifting equipment (including agents of the shipment's owners). This raises a strong and reasonable inference that she was in knowing possession of stolen property.
 
 
 20
 Circumstantial evidence tending to show guilty knowledge need not compel a finding of such knowledge in order to sustain a conviction; all that is necessary is that reasonable jurors could be convinced beyond a reasonable doubt that the defendants had guilty knowledge.
 
 
 21
 Flaherty, 668 F.2d at 566 (citation omitted). See Adamo, 742 F.2d at 932 ("It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt.") (citations omitted).
 
 
 22
 Additionally, we note that, along with the evidence discussed above, the jury could have inferred guilty knowledge from Bomba's unexplained possession of recently stolen goods. Barnes v. United States, 412 U.S. 837 (1973). See United States v. Johnson, 741 F.2d 854 (6th Cir.), cert. denied, 469 U.S. 1075 (1984).[8] The trial judge properly so instructed the jury. We conclude that the government presented sufficient evidence from which a rational jury could have found, beyond a reasonable doubt, that Bomba knew that the weight lifting equipment was stolen. Accordingly, the appellant's conviction is AFFIRMED.
 
 
 
 *
 The Honorable Thomas A. Wiseman, Jr., Chief United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 Bomba was also convicted of conspiracy to receive, possess, conceal and store a 1982 Ford model CLT 900 truck, which had crossed a state boundary after having been stolen, in violation of 18 U.S.C. Secs. 371, 2313 (1982)
 
 
 [2]
 By prior agreement, Harris was to receive the remainder of his payment from S & M Transportation after completing the delivery to Fitness
 
 
 [3]
 Bomba's daughter boarded an airplane at the Dallas-Fort Worth airport
 
 
 [4]
 S & M Transportation had called Fitness two days earlier instructing it not to pay Harris because, according to S & M Transportation, he had already received money for the delivery
 
 
 [5]
 Bomba testified that she knew the weight lifting equipment was sold, but denied having any involvement in the sale
 
 
 [6]
 Although Bomba denied speaking to Weatherman on December 28, she admitted making similar statements to him on or after December 30
 
 
 [7]
 Bomba also testified that, after Harris abandoned her truck in late December 1981, she had no physical contact with him until at least March 1983. However, when FBI agent King came to her house for a second interview in September 1982, he met and interviewed Harris
 
 
 [8]
 In Barnes, 412 U.S. at 845 n. 9, the Supreme Court noted that "the mere fact that there is some evidence tending to explain the defendant's possession consistent with innocence does not bar instructing the jury on the inference.... The jury is not bound to accept or believe any particular explanation any more than it is bound to accept the correctness of the inference."